**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

JACQUELINE WILLIAMS-LESTER,          )
                                     )
        Plaintiff,                   )
                                     )        No. 3:15-cv-00719
v.                                   )        Senior Judge Haynes
                                     )
SOCIAL SECURITY ADMINISTRATION,      )
                                     )
        Defendant.                   )

**M E M O R A N D U M**

Plaintiff, Jacqueline Williams-Lester, filed this action under 42 U.S.C. § 405(g) against the

Defendant, Carolyn Colvin, Acting Commissioner of Social Security, seeking judicial review of the

Commissioner's denial of her applications for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.

Before the Court is Plaintiff's motion for judgment on the Administrative Record (Docket

Entry No. 14), to which the Commissioner filed her Response (Docket Entry No. 16), to which

Plaintiff filed her reply (Docket Entry No. 17). In her Motion, Plaintiff contends that the ALJ erred

by (1) misrepresenting and failing to consider properly the opinions of Dr. Scott Baker, one of

Plaintiff's treating physicians; (2) misrepresenting and failing to consider properly the opinions of

Dr. Charles Gill, Jr., another one of Plaintiff's treating physicians; and (3) incorrectly finding that

Plaintiff's bladder impairments were "non-severe" and thus failing to incorporate bladder

impairments in his assessment of Plaintiff's residual functional capacity ("RFC"). (Docket Entry No.

15 at 1-2). The Commissioner argues that the ALJ's decision is supported by substantial evidence.

(Docket Entry No. 16 at 4).

Plaintiff's applications for DIB and SSI benefits initially were denied on December 31, 2008 and after reconsideration on February 25, 2009. (Docket Entry No. 10, Administrative Record, at 70-73, 81-84)[1]. Plaintiff filed a timely written request for a hearing before an ALJ and after a hearing the ALJ denied Plaintiff's claims. Id. at 23-35. Plaintiff filed a request for review of the ALJ's decision with the Appeals Council that was denied, rendering the ALJ's decision the Commissioner's final decision. Id. at 1-3. Plaintiff appealed the ALJ's decision to the United States District Court for the Middle District of Tennessee, and the Honorable John T. Nixon granted the Commissioner's unopposed motion requesting remand for further administrative proceedings. Id. at 981. On remand, the Appeals Council vacated the Commissioner's final decision and remanded Plaintiff's case to an ALJ to consider Plaintiff's complete medical history, including records that were submitted after Plaintiff's hearing but that were not added to the record. Id. at 991-93.

The same ALJ conducted another hearing and denied Plaintiffs claims, based upon the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since January 1, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: lumbar degenerative disc disease, depression, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

---

[1]The Court's citations are to the pagination in the Administrative Record, not in the electronic case filing system.

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she is limited to jobs which allow a worker to alternate sitting and standing every hour; cannot more than frequently push or pull with either leg; cannot more than occasionally climb, balance, kneel, stoop, crouch or crawl; is limited to simple repetitive work; cannot maintain attention or concentration for more than two hours without interruption; cannot interact with the public; and cannot have more than occasional interaction with others.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on August 5, 1970 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Id. at 877-88. Plaintiff filed a request for review of the ALJ's decision with the Appeals Council that was denied. Id. at 862-65. The Appeals Council's denial rendered the ALJ's decision the Commissioner's final decision. Id. at 864.

## A. Review of the Record

Plaintiff is forty-five years old and completed three years of college course work. Id. at 152, 904-05. The Administrative Record contains Plaintiff's medical records that predate Plaintiff's alleged onset date of January 1, 2008. Id. at 124, 130.

On January 9, 2008, Plaintiff complained of worsening lower back pain to Dr. Scott Baker of Tennessee Physical Medicine and Pain Management. Id. at 391. Plaintiff rated that her pain averaged seven out of ten. Id. Dr. Baker diagnosed Plaintiff with bilateral lumbar radiculopathy and secondary lumbar myofascial pain, left trochanteric bursitis, and chronic pain. Id. Dr. Baker noted that an MRI reflected "mild degenerative disc disease art L4-L5 and mild multilevel facet arthropathy" but he "d[id] not believe this [was] a major source of pain . . . ." Id. Plaintiff stated that her medications were working well, and included Altace, clonidine, Cymbalta, Duragesic, Mobic, Neurontin, Opana, Premarin, Tylenol PM, and Zanaflex. Id.

On January 17, 2008, Plaintiff returned to Dr. Baker complaining of low back pain and left leg pain. Id. at 475. As part of an "ongoing conservative management program for her symptoms," Dr. Baker administered Plaintiff a "left L4-5 selective transforaminal epidural steroid injection . . . ." There were not any complications. Id. at 476.

On February 6, 2008, Plaintiff returned to Dr. Baker regarding low back pain. Id. at 389. Plaintiff stated that her pain averaged six out of ten and caused her trouble sleeping, but that her medications were working well. Id. Plaintiff's diagnoses and medications were unchanged from her January 9 visit. Id. at 389, 391.

On February 25, 2008, Plaintiff received another injection to treat her lumbar degenerative disc disease and there were not any complications. Id. at 467. That same day, a CT scan reflected

impressions of "very mild bulge at L2-3," contained contrast "within the nucleus pulpusos at L3-4," and "extension of contrast into the annulus fibrosis at L4-5 and L5-S1" with "mild bulge along the right side of the disc at L5-S1 involving the anterior right neural foramen without compromise." Id. at 718.

On March 5, 2008, Plaintiff returned to Dr. Baker regarding her lower back pain. Id. at 469. Plaintiff stated that her condition was unchanged, that her pain averaged six out of ten, and that her medications were working well. Id. Plaintiff's diagnoses and medications were unchanged from her January 9 visit. Id. at 391, 469.

On March 17, 2008, Plaintiff visited Dr. Christopher Kauffman for evaluation of her lumbar spine. Id. at 625. Dr. Kauffman noted that Plaintiff had moderate tenderness over the lower lumbar area, decreased forward flexion, and pain that increased with forward flexion and decreased with extension. Id. Plaintiff also experienced pain in the lower back and buttock with a straight leg raise. Id. at 626. Based on his review of Plaintiff's medical imaging, Dr. Kauffman diagnosed Plaintiff with degenerative disc disease at L4-L5 with concordant pain. Id. As to urinary conditions, Dr. Kauffman noted that Plaintiff previously underwent three bladder surgeries due to bladder incontinence and difficulty urinating. Id. at 625.

On April 18, 2008, Plaintiff visited the Matthew Walker Comprehensive Health Center regarding severe pain in both of her hands and wrists that gradually arose over the past six months. Id. at 346. Plaintiff stated that the pain was aggravated by movement and resulted in decreased mobility, difficulty going to sleep, night pain, night-time awakening, swelling, arm tingling, tenderness, and weakness. Id.

On April 30, 2008, Plaintiff returned to Dr. Baker regarding her lower back pain and stated

5

that her pain averaged nine out of ten. Id. at 465. Plaintiff stated that her condition was worsening due to increased work around her house and that her medications were not working well that day. Id. Plaintiff desired surgical treatment for her back. Id. On May 28, 2008, Plaintiff reported to Dr. Baker that her pain averaged five out of ten and again expressed her desire for surgical treatment. Id. at 387. Plaintiff's diagnoses and medications for both visits were unchanged from her January 9 visit. Id. at 387, 391, 465.

On a June 12, 2008 disability report, Plaintiff described her inability to work as due to problems with her back, knee, hands, arm, and wrist. Id. at 147. Plaintiff stated that she could not sit or stand for an extended period of time, that her knees gave out on her, and that her pain limited her ability to pick things up. Id.

On June 16, 2008, Plaintiff returned to Dr. Kauffman, complaining of back pain, "bilateral lower extremity pain," numbness in three toes, and burning in her buttocks and legs. Id. at 829. Plaintiff also stated that she had bladder problems and bladder incontinence, including sleeping with a pad and sometimes losing almost all of her urine. Id. Dr. Kauffman noted that Plaintiff decided to proceed with surgery for an L4-L5 laminectomy and instrumented fusion. Id. Dr. Kauffman opined that "surgery has a good chance of decreasing [Plaintiff's] pain but will not make her pain free." Id. Dr. Kauffman diagnosed Plaintiff with L4-L5 degenerative disc disease, low back pain, and lumbar stenosis. Id. at 830. On June 19, Plaintiff returned to Dr. Kauffman and again stated that she wanted to proceed with surgery, specifically an "L4-5 laminectomy and instrumented fusion for decompression of nerve roots and stabilization of the spine." Id. at 1207. Dr. Kauffman diagnosed Plaintiff with L4-5 degenerative disc disease, lumbar stenosis, and back and leg pain. Id. at 1210.

On June 25, 2008, Plaintiff returned to Dr. Baker and stated that her condition was worsening and that her pain averaged ten out of ten, although her medications were working well. Id. at 385. Plaintiff's diagnoses and medications were unchanged from her January 9 visit. Id. at 385, 391.

On July 1, 2008, Plaintiff presented to University Medical Center for her scheduled L4-5 laminectomy and instrumented fusion. Id. at 1205. Dr. Kauffman performed the procedure and noted that Plaintiff "tolerated the procedure well and [was] doing well postoperatively." Id. at 1204. Plaintiff was discharged as stable on July 4. Id. at 367. On July 9, Plaintiff visited Dr. Kauffman to follow-up on her surgery and complained of left leg swelling. Id. at 350. Dr. Kauffman noted that Plaintiff's surgical wound was "well healed" and that medical imaging reflected "the hardware to be in good position and [that Plaintiff's] lordosis is well maintained." Id. at 350.

On July 23, 2008, Plaintiff returned to Dr. Baker and stated that her pain averaged seven out of ten, that her condition was unchanged, and that her medications were working well. Id. at 383. Dr. Baker noted that Plaintiff was "making slow progress" following her surgery and that her leg pains were "substantially improved." Id. Dr. Baker added "azmacort inhalation aerosol" to Plaintiff's list of medications and removed the diagnosis for lumbar myofascial pain. Id.

On July 30, 2008, Plaintiff visited Dr. Kauffman and reported that her leg pain had improved, though she was experiencing some buttock pain. Id. at 826. Dr. Kauffman noted that Plaintiff's wound was "well healed" and that she was "making significant improvements." Id.

On August 5, 2008, Plaintiff visited Tennessee Orthopedics for physical therapy and was instructed regarding a home exercise program. Id. at 1215-16.

On an August 10, 2008 pain questionnaire, Plaintiff stated that her back, buttocks, and leg pain began on June 19, 2001 and increased over time. Id. at 155. Plaintiff also stated that she had

pain, acid reflux, high blood pressure, migraines, bladder problems, anxiety/depression, and hand, foot, and knee pain. Id. at 157. Plaintiff noted that her medications did not completely relieve her pain but helped her get through the day. Id. at 155. Plaintiff reported that she used a walker and that her pain was relieved by hot showers, massages, and lying down. Id. at 156. Plaintiff stated that the pain was constant and was brought on by standing, sitting, walking, or lying down too long. Id. at 155. Plaintiff reported that she could: sit, stand, or walk for no more than thirty to forty-five minutes; never stoop, kneel, crouch, or crawl; and lift and carry five pounds. Id. at 156. As to her daily activities, Plaintiff reported that she walked to the end of the driveway two or three times, needed help shopping, rarely drove due to her medications, and did very little socializing. Id.

On August 20, 2008, Plaintiff visited Tennessee Physical Medicine and Pain Management regarding her lower back pain and stated that her pain averaged six out of ten and that her condition was unchanged. Id. at 381. Plaintiff reported that her medications were working well and that she was trying to walk without her walker. Id. Plaintiff's diagnoses and medications were unchanged from her July 23 visit except that Plaintiff's Opana was replaced with morphine sulphate. Id. at 381, 383.

On September 15, 2008, Plaintiff returned to Dr. Baker and reported that her pain averaged seven out of ten and that her condition was worsening, including increased swelling and pain in her lower back radiating into her left leg and foot. Id. at 379. Plaintiff stated that her medications helped "some" with her pain. Id. Plaintiff's diagnoses and medications were unchanged from her August 20 visit except that Plaintiff was no longer taking Tylenol PM. Id. at 379, 381.

On September 24, 2008, Plaintiff visited Dr. Kauffman and complained of left leg problems and worsened bladder incontinence following her L4-L5 laminectomy and fusion. Id. at 623. Dr.

8

Kauffman opined that Plaintiff's bladder issues were "most likely secondary to her multiple bladder surgeries" and noted that Plaintiff was not wearing a diaper despite Plaintiff's report that she "wears diapers all the time." Id.

On October 13, 2008, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged seven out of ten and that her condition was worsening, including increased swelling and pain in her lower back. Id. at 377. Plaintiff reported that her medications were working well. Id. The office note reflects that Plaintiff was "still only 3 and a half months post lumbar surgery" and the belief that "she will continue to improve." Id. Plaintiff's diagnoses and medications were unchanged from her September 15 visit. Id. at 377, 379.

On November 10, 2008, Plaintiff again returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged five out of ten, that her condition was improving, and that her medications were working well. Id. at 448. The office note reflects that Plaintiff's leg pains had "substantially improved" though she was "still having trouble with urination and leg swelling." Id. Plaintiff's diagnoses and medications were unchanged from her September 15 visit. Id. at 379, 448.

On November 12, 2008, Plaintiff visited Dr. Kauffman and reported that her right leg pain improved but that her left leg was bothersome and that she was still having urination problems. Id. at 498. Dr. Kauffman reviewed a CT myelogram and found that the screws and grafts from Plaintiff's surgery were not putting pressure on her nerves and the screws were "well within the bone." Id. As to her bladder issues, Dr. Kauffman opined that there would be more information after Plaintiff underwent a cystometrogram. Id.

9

On November 26, 2008, Dr. Roy Johnson reviewed Plaintiff's medical records and examined Plaintiff as part of the disability determination. Id. at 396. Plaintiff complained of right leg burning and tingling, occasional swelling in her left leg, hand pain, depression, as well as back and leg pain that disrupted her sleeping. Id. Plaintiff reported that her conditions were alleviated by medication and rest and exacerbated by prolonged sitting, standing, or lying for too long. Id. Dr. Johnson diagnosed Plaintiff with status post discectomy lumbar spine, low back syndrome with radiculopathy, status post left knee arthroscopic surgery, and possible cumulative trauma disorder to her left wrist. Id. at 398. Dr. Johnson found that Plaintiff could occasionally lift twenty pounds and stand and walk for four hours with normal breaks during an eight-hour shift. Id. at 399. Dr. Johnson also found that Plaintiff should avoid overhead work and repetitive bending of the back, and that Plaintiff's "work activity should not exceed any restrictions placed on her by her treating physician." Id.

On December 8, 2008, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged seven out of ten and that her condition was unchanged. Id. at 446. Plaintiff's diagnoses and medications were unchanged from her September 15 visit. Id. at 379, 446.

On December 30, 2008, Dr. Zwi Kahanowicz completed a Physical RFC Assessment as part of the disability determination and found that Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for at least two hours in an eight-hour work day; and sit for about six hours in an eight-hour work day. Id. at 401. Dr. Kahanowicz stated that Plaintiff had occasional limitations as to kneeling, crouching, crawling, and climbing ladder, rope, and scaffolds. Id. at 402. Dr. Kahanowicz also stated that Plaintiff had frequent

limitations with balancing, stooping, and climbing ramp and stairs. Id.

On December 31, 2008, examiner Roshelle Pickens completed a vocational analysis, concluding that Plaintiff could lift a maximum of twenty pounds, or ten pounds frequently; could stand or walk for four hours per day; and could sit for six hours per day. Id. at 170. Pickens found that Plaintiff had occasional limitations with kneeling, crouching, crawling, and climbing ladder, rope, and scaffolds. Id. Pickens also found that Plaintiff had frequent limitations balancing, stooping, and climbing ramp and stairs. Id. The report reflects no mental limitations. Id. Pickens found that Plaintiff could perform past work as a credit clerk. Id. at 171.

On January 6, 2009, Plaintiff returned to Dr. Baker and stated that her pain averaged eight out of ten and that her condition was worsening. Id. at 444. Plaintiff stated that her medications were working but that her pain was worse due to cold weather. Id. Plaintiff received a trochanteric bursa injection to treat her pain and there were not any complications. Id. at 445. Plaintiff's diagnoses and medications were unchanged from her September 15, 2008 visit. Id. at 379, 444.

On February 2, 2009, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged seven out of ten and that her condition was worsening, including increased pain in her left lower back. Id. at 442. Plaintiff stated that her medications were working well. Id. Plaintiff received injections in her hips to treat her pain and there were not any complications. Id. at 443. Plaintiff's diagnoses and medications were unchanged from her September 15, 2008 visit. Id. at 379, 442.

On a February 5, 2009 medical source statement, Dr. Baker checked boxes reflecting that Plaintiff could occasionally lift up to ten pounds and never carry up to ten pounds. Id. at 409. Dr. Baker explained that these limitations were supported by Plaintiff's back pain, exquisite tenderness,

11

decreased lumbar range of motion, and bladder and bowel issues. Id. Dr. Baker also checked boxes reflecting that Plaintiff could sit, stand, or walk for thirty minutes without interruption. Id. at 410. In an eight-hour work day, Dr. Baker found that Plaintiff could sit or stand for three hours and walk for two hours. Id. Dr. Baker found that Plaintiff could never push/pull, occasionally handle and finger, and frequently reach and feel. Id. at 411. Dr. Baker explained that Plaintiff's's hand limitations were supported by her "lumbar fusion surgery with chronic radiculopathy and severe pain." Id. Dr. Baker opined, "if [Plaintiff] injures herself further, it may result in the need for more surgery or possible permanent disability." Id. Dr. Baker found that Plaintiff could occasionally operate foot controls due to "radicular pain and weakness related to nerve damage." Id. Because of Plaintiff's "extremity weakness and numbness," Dr. Baker found that Plaintiff could occasionally stoop and climb stairs and ramps, but never balance, kneel, crouch, crawl, or climb ladders or scaffolds. Id. at 412. Dr. Baker found that Plaintiff could occasionally operate a motor vehicle and be exposed to humidity and wetness, but never be exposed to unprotected heights, moving mechanical parts, pulmonary irritants, extreme cold, extreme heat, or vibrations. Id. at 413. Dr. Baker also found that Plaintiff could tolerate moderate noise. Id. Dr. Baker checked a box reflecting that Plaintiff could not "walk a block at a reasonable pace on rough or uneven surfaces." Id. at 414.

On March 4, 2009, Plaintiff visited Dr. Baker and stated that her pain averaged seven out of ten, but her medications were working well. Id. at 440. Plaintiff's diagnoses and medications were unchanged from her September 15, 2008 visit. Id. at 379, 440.

On March 9, 2009, Plaintiff completed a disability report for her appeal, stating that her condition had changed since June 2008 due to her spinal fusion, additional blood pressure problems, foot problems, worsened anxiety and depression, and more severe acid reflux. Id. at 174. Plaintiff

stated, "my bladder problems have gotten worse since surgery and [I] have to wear diapers and keep pads on the bed." Id. at 174-75. Plaintiff reported that she could occasionally lift ten pounds and never carry any weight or push/pull, balance, kneel, or crouch. Id. at 175. Plaintiff also reported that she could sit, stand, or walk for up to thirty minutes without interruption. Id. Plaintiff stated that she could "only drive occasionally and for short distances" due to lower extremity weakness, leg numbness, and her medications. Id. at 181.

On a March 24, 2009 pain questionnaire, Plaintiff stated that she experienced constant back, hip, and leg pain. Id. at 184. Plaintiff noted that her medications relieved, but did not eliminate her pain and caused side effects of dry mouth, constipation, fatigue, memory loss, and insomnia. Id. Plaintiff also noted that, to relieve her pain, she occasionally used bandages, knee braces, a back brace, and a left shoe insert. Id. at 185.

On an April 18, 2009 function report, Plaintiff stated that her conditions limited her to staying home, doing occasional light house work, and poor sleep. Id. at 197-98. Plaintiff stated that she sometimes cooked small meals, could dress herself, shower, feed herself, and use the toilet when she "g[ot] there quick enough." Id. Plaintiff reported that she rarely drove due to her medications and left the house to see her pain specialist once a month and shop for groceries only "once or twice a month." Id. at 199-200. Plaintiff stated that she rarely spent time with others and "sometimes h[ad] panic attacks around people and g[ot] aggravated." Id. at 201. Plaintiff checked boxes reflecting that she had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, remembering, completing tasks, concentrating, using hands, and getting along with others. Id. Plaintiff reported that she could occasionally lift up to ten pounds, and walk and sit for up to thirty minutes at once. Id. Plaintiff stated that she had problems handling stress and changes in routine. Id.

at 202. Plaintiff reported that she often used a knee brace and wore glasses or contact lenses daily. Id.

On April 28, 2009, Plaintiff visited Dr. Charles Gill at Urology Associates and reported that her previously resolved bladder issues had returned after she woke up from work-related back injury. Id. at 495. Plaintiff complained of "urgency, frequency, and very heavy asensory urinary leakage." Id. Dr. Gill noted that Plaintiff's bladder symptoms were "very severe and not responsive to conventional treatment." Id. at 497. Dr. Gill opined, "I believe [Plaintiff] is a good candidate for InterStim placement." Id.

On May 7, 2009, Dr. Linda Blazina interviewed Plaintiff for a psychological evaluation as part of the disability determination and diagnosed her with dysthymic disorder and anxiety disorder. Id. at 544. Dr. Blazina concluded that Plaintiff was not impaired in her ability to understand and remember short and simple instructions; mildly impaired in her ability to understand and remember complex detailed instructions due to depression; moderately impaired in her ability to maintain concentration and attention due to depression, anxiety, and chronic pain; mildly impaired in social interaction abilities due to depression and anxiety; and moderately impaired in her ability to adapt to changes in a work routine and tolerate workplace stress due to depression, anxiety, and chronic pain. Id. at 544.

On May 8, 2009, Plaintiff visited Dr. Kauffman and reported that the lumbar fusion helped her right leg pain, but not her left leg or back pain. Id. at 820. Medical imaging reflected that her fusion was "maturing well" with "no significant disc degeneration above or below the fusion." Id. at 821. Dr. Kauffman noted that he encouraged Plaintiff to continue increasing her activities and work with Dr. Baker on trying to decrease her pain medications if possible. Id.

On May 22, 2009, Plaintiff visited Tennessee Physical Medicine and Pain Management and stated that her pain averaged seven out of ten, that her condition was unchanged, and that her medications were working well. Id. at 589. Plaintiff's diagnoses and medications were unchanged from her September 15, 2008 visit. Id. at 379, 589.

On June 23, 2009, Dr. Christopher Fletcher, a consultant, reviewed Plaintiff's medical records and completed a Physical RFC Assessment as part of the disability determination. Dr. Fletcher found that Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for four hours in an eight-hour work day; and sit for about six hours in an eight-hour work day. Id. at 547. Dr. Fletcher also found that Plaintiff was limited in pushing/pulling with the lower extremities due to trochanteric bursitis. Id. Dr. Fletcher stated that Plaintiff had occasional limitations balancing, stooping, kneeling, crouching, crawling, and climbing ramp, stairs, ladder, rope, and scaffolds. Id. at 548. Dr. Fletcher concluded that Plaintiff's "statements of pain and limitation are only partially credible" and determined that Plaintiff's bladder incontinence was "non severe." Id. at 554.

On July 1, 2009, Dr. Gill responded to a request to clarify how Plaintiff's bladder symptoms related to her back surgery and injury. Id. at 1670. Dr. Gill stated:

> [Plaintiff] had stress urinary incontinence back in 2004. At that time she underwent a complex cystometrogram which was normal, with no evidence of bladder detrusor instability. She underwent a bladder neck suspension, and her stress incontinence resolved. She has had symptoms of urinary urgency and frequency, to varying degrees, since then.
>
> She underwent a bladder procedure by another physician, and says that her bladder symptoms did resolve following that.
>
> She has now suffered a back injury, and subsequent laminectomy, and tells me that immediately following her laminectomy her bladder symptoms of urinary urgency,

frequency, nocturia, and heavy incontinence developed.

I cannot state the degree of bladder instability or neurogenic dysfunction without a complex cystometric study, especially since we can compare it to the one done back in 2004. This could help clarify her symptoms and the relationship to her back injury and surgery. Subsequently, I think she would be a good candidate for a InterStim neuromodulator to help control these bladder symptoms.

Thus, I am recommending a complex cystometric and urodynamic evaluation.

Id. at 1670.

On July 22, 2009, Plaintiff visited Tennessee Physical Medicine and Pain Management and stated that her pain averaged eight out of ten and that her condition was worsening, including increased pain in her lower back. Id. at 587. Plaintiff stated that her medication helped "some." Id. Plaintiff's diagnoses and medications were unchanged from her September 15, 2008 visit. Id. at 379, 587.

On July 23, 2009, Plaintiff presented to Dr. Gill regarding her neurogenic bladder. Id. at 763. Dr. Gill described Plaintiff's cystometric studies completed July 15 as reflecting "low amplitude spontaneous involuntary to two contractions throughout the filling phase on two separate studies. Also showed one very high amplitude spontaneous involuntary detrusor contraction which resulted in massive leakage." Id. Dr. Gill opined that Plaintiff was a good candidate for InterStim and that Plaintiff's neurogenic bladder was related to her back injury. Id. at 763, 1649.

On July 30, 2009, Dr. Mason Currey reviewed Plaintiff's records and completed a psychiatric review technique as part of Plaintiff's disability determination and concluded that an RFC Assessment was necessary due to Plaintiff's dysthymic and anxiety-related disorders. Id. at 555, 558, 560. Dr. Currey found that Plaintiff was mildly limited in activities of daily living and moderately limited in maintaining social functioning and maintaining concentration, persistence, or pace. Id. at

16

565. Dr. Currey considered Plaintiff's allegations credible, but gave great weight to the May 2009 psychological evaluation reflecting no more than moderate impairments in functional abilities due to mental health problems. Id. at 567.

That same day, Dr. Currey completed a Mental RFC Assessment and checked boxes reflecting that Plaintiff was moderately limited in her abilities: to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. Id. at 569-70. Dr. Currey concluded that Plaintiff could carry out simple and detailed instructions; and that Plaintiff would have some, but not substantial difficulties with maintaining attention and concentration for extended periods, working in coordination with or proximity to others without being distracted by them, and completing a normal workday/workweek at a consistent pace without interruptions from psychologically based symptoms. Id. at 571. Dr. Currey also concluded that Plaintiff could adapt to infrequent change and would have some, but not substantial difficulty interacting with the public, coworkers, and supervisors. Id.

On July 31, 2009, examiner Carmen Bissell completed a vocational analysis and concluded that Plaintiff could: lift a maximum of twenty pounds, or ten pounds frequently; stand or walk for four hours per day; sit for six hours per day; and frequently engage in light pushing or pulling with her legs. Id. at 204. Bissell found that Plaintiff had occasional limitations balancing, stooping,

17

kneeling, crouching, crawling, and climbing ramp, stairs, ladder, rope, and scaffolds. Id. Bissell repeated Dr. Currey's July 30 Mental RFC Assessment regarding areas of moderate mental limitations. Id. Bissell found that Plaintiff could perform past relevant work as a credit clerk. Id. at 205.

On August 21, 2009, Plaintiff visited Tennessee Physical Medicine and Pain Management and stated that her pain averaged ten out of ten and that her condition was worsening, including increased pain in her lower back. Id. at 581. Plaintiff stated that her medication helped "some." Id. Dr. Gailbreath noted that Plaintiff was "now over one year out of surgery and still having pain." Id. Dr. Gailbreath also noted that Plaintiff was still having trouble with urination and leg swelling. Id. Plaintiff's diagnoses and medications were unchanged from her September 15, 2008 visit. Id. at 379, 581.

On August 24, 2009, Dr. Gill performed a procedure for Plaintiff to receive an InterStim. Id. at 1640-42. On August 31, Plaintiff returned to Dr. Gill for a one week "check up-post op from interstim placement last 1-(trial period)" and there were not any complications. Id. at 755. Plaintiff stated that she wanted to proceed with "placement of a permanent generator." Id. at 1636.

On September 16, 2009, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged six out of ten, that her condition was unchanged, and that her medications were working well. Id. at 585. Dr. Gailbreath noted that Plaintiff was scheduled to receive a "bladder stimulator" on September 24. Id. Plaintiff's diagnoses and medications were unchanged from her September 15, 2008 visit. Id. at 379, 585.

On September 24, 2009, Dr. Gill implanted Plaintiff with a permanent generator, also known as an InterStim. Id. at 743. On October 5, Plaintiff followed up with Dr. Gill and he noted that

Plaintiff was "doing very well." Id. at 742.

On October 14, 2009, Plaintiff visited Tennessee Physical Medicine and Pain Management and stated that her pain averaged eight out of ten, but her medications were working well. Id. at 583. Plaintiff's diagnoses and medications were unchanged from her September 15, 2008 visit. Id. at 379, 583.

On October 24, 2009, Plaintiff completed a disability report for her appeal, stating that her condition had changed since March 2009 due to her bladder surgery to implant an InterStim. Id. at 208. Plaintiff reported that she was in constant pain and mentally felt like she was "falling apart." Id.

On November 11, 2009, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged five out of ten, but her medications were working well. Id. at 575. The office note reflects that Plaintiff's pain was increased that day and it was recommended that Plaintiff receive a cortisone injection. Id. Plaintiff's diagnoses and medications were unchanged from her September 15, 2008 visit. Id. at 379, 575.

On November 18, 2009, Plaintiff visited Dr. Kauffman and reported that her right leg pain had improved, but not her back pain. Id. at 818. Plaintiff stated that her bladder issues worsened following her lumbar fusion, but that the InterStim implanted in September had helped. Id. Medical imaging reflected that her fusion was "maturing in the interbody space" and that the hardware from her fusion was in "good position." Id. at 819.

On February 5, 2010, Plaintiff visited Tennessee Physical Medicine and Pain Management and stated that her pain averaged five out of ten, but her medications were working well for her. Id. at 579. The office note reflects that Plaintiff had increased pain that day and the recommendation was

19

a cortisone injection. Id. Plaintiff's diagnoses and medications were unchanged from her September 15, 2008 visit. Id. at 379, 579.

On March 31, 2010, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain was constant and averaged eight out of ten. Id. at 798. Plaintiff described the pain as "aching, a dull, a sharp, and a shooting sensation." Id. Plaintiff was diagnosed with lumbosacral radiculopathy, chronic pain syndrome, enthesopathy of the hip region, and postlaminectomy syndrome of lumbar region. Id. at 799. Plaintiff's medications were cymbalta, duragesic, mobic, morphine sulphate, neurotonin, senokot, and skelaxin. Id. at 798.

On April 29, May 27, and June 17, 2010, Plaintiff received epidural steroid injections to treat her low back and leg pain. Id. at 792, 794, 796.

In June, July, August, October, and November 2010, Plaintiff visited Tennessee Physical Medicine and Pain Management once per month. On June 30, Plaintiff stated that her pain was constant and averaged eight out of ten. Id. at 789. On July 28, Plaintiff stated that her pain was constant, averaged seven out of ten, and that her back pain was radiating down her left leg to her fifth toe. Id. at 786. On August 25, Plaintiff stated that her pain was constant and averaged five out of ten. Id. at 783. For these three visits, Plaintiff's diagnoses and medications were unchanged from her March 31 visit. Id. at 783-84, 787-90, 798-99.

On October 21, Plaintiff stated that her pain occurred 80% of the time while awake and averaged six out of ten. Id. at 780. Plaintiff reported that her right leg was still a problem and that she was having trouble balancing. Id. Plaintiff's medications were unchanged from her March 31 visit, but the progress note reflects the removal of Plaintiff's diagnosis for "enthesopathy of the hip region" and addition of a diagnosis for trochanteric bursitis. Id. at 780-81, 798-99. On November 18,

Plaintiff stated that her pain averaged five out of ten, that her condition was unchanged, and that she was sleeping and feeling better. Id. at 777. Plaintiff described her pain as "aching." Id. Plaintiff's diagnoses were unchanged from her October 21 visit, but the progress note reflects the addition of Valium to her medications. Id. at 777-78, 780-81.

On December 16, 2010, Plaintiff presented to the University Medical Center Emergency Room complaining of cold symptoms, and had chest pain, cough, and congestion. Id. at 1241. Plaintiff was diagnosed with a urinary tract infection and acute bronchitis and discharged that same day. Id. at 1243.

On December 17, 2010, Plaintiff visited Dr. Gill for reprogramming of her InterStim. Id. at 738. Dr. Gill prescribed Plaintiff pyridium. Id.

On January 13, 2011, Plaintiff visited Tennessee Physical Medicine and Pain Management and rated her pain a six out of ten. Id. at 774. Plaintiff described her pain as aching and stated that it radiated down her left leg to her left ankle. Id. Plaintiff's diagnoses and medications were unchanged from her November 18, 2010 visit. Id. at 774-75, 777-78.

On March 14, 2011, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain was eight out of ten. Id. at 771. Plaintiff reported aching pain that radiated to her left hip, buttock, and leg. Id. The office note reflects that Plaintiff's pain was "consistent with the levels of her spine that she has had surgery on." Id. at 772. Plaintiff's diagnoses and medications were unchanged from her November 18, 2010 visit. Id. at 771-72, 777-78.

On March 23, 2011, Plaintiff visited Dr. Kauffman to follow-up on a recent CT scan and Dr. Kauffman opined that the scan reflected "bone growing through the cages. There is no stenosis at any other levels. There is mild disc bulging without any neurologic impingement." Id. at 816-17.

Plaintiff complained of increased left lower extremity pain and minimal right lower extremity pain, as well as numbness and generalized weakness. Id. at 816. Dr. Kauffman opined that Plaintiff's bladder symptoms were "more likely than not" unrelated to her back surgery. Id. Dr. Kauffman also opined that it was "unlikely this patient would ever get any significant relief from any further surgery as she got almost no relief from the first surgery." Id. at 817. Dr. Kauffman diagnosed Plaintiff with status post L4-L5 laminectomy and fusion without relief of pain; longstanding low back symptoms; and urinary incontinence likely secondary to multiple bladder surgeries and longstanding problems. Id.

On March 31, 2011, Plaintiff visited Dr. Gill and complained of urinary urgency, frequency, and incontinence. Id. at 733. Plaintiff reported that she had turned her InterStim off for "several months" as she did not think it was helping and Dr. Gill recommended resuming the InterStim. Id.

On April 11, 2011, Dr. Baker completed a medical source statement and listed Plaintiff's impairments as post-laminectomy syndrome, chronic pain syndrome, and lumbosacral radiculopathy. Id. at 614. Dr. Baker checked a box reflecting that Plaintiff could not be reasonably expected to be reliable in attending an eight hour a day, forty hour work week, week after week, without missing more than two days per month in view of the degree of pain or other symptoms she experiences. Id. Dr. Baker found that Plaintiff could sit for four hours, stand with breaks for two hours, and walk with breaks for two hours out of an eight-hour day. Id. Dr. Baker checked boxes reflecting that Plaintiff could lift or carry 1-5 pounds continuously, 6-10 pounds frequently, 11-20 pounds occasionally, and never more than 21 pounds. Id. Dr. Baker also checked boxes reflecting that Plaintiff could never bend, squat, kneel, or crawl; occasionally climb stairs or walk on uneven surfaces; frequently reach above her shoulders; and continuously use her hands for fine manipulation. Id. at 615. Dr. Baker

noted that Plaintiff required one hour of daily bed rest. Id. Dr. Baker also noted that the side effects of Plaintiff's medications could affect her concentration and that Plaintiff had problems with stamina that would interfere with her daily activities in a work environment. Id. Dr. Baker found that Plaintiff's impairments restricted her from heights and moving machinery. Id. Dr. Baker found that it was reasonable to expect that Plaintiff's condition would cause chronic pain in her lower back and left leg. Id. at 615-16. Dr. Baker found that Plaintiff's pain was severe and adversely affected her concentration and sleep. Id. at 616. Dr. Baker noted that Plaintiff needed to elevate her legs five times per day for one-to-two hours. Id. Dr. Baker checked a box reflecting that Plaintiff suffered from depression, anxiety, memory or mental problems, or a similar disorder that may have affected her work activities. Id. Dr. Baker noted that his medical source statement was supported by objective evidence in his treatment notes and records that may not be evident on the face of his treatment notes, including medical history, physical exams, and clinical observations. Id. at 617.

On April 11, 2011, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged eight out of ten. Id. at 768. Plaintiff reported continued insomnia and worsened typical radicular pain. Id. at 769. Plaintiff's diagnoses were unchanged from her November 18, 2010 visit, but her Valium prescription was replaced with Lunesta. Id. at 769-70, 777-78.

On May 11, 2011, Plaintiff again visited Tennessee Physical Medicine and Pain Management and stated that her pain averaged nine out of ten. Id. at 1459. Plaintiff reported that she had aching pain that radiated to her right hip, right leg and ankle, left buttock, and left leg and ankle. Id. at 1459. Compared to Plaintiff's April 11 visit, the office note reflects an additional prescription for Valium and additional diagnoses of sleep disturbances and restless leg syndrome. Id. at 777-78, 1460-61.

23

On June 8, 2011, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged eight out of ten. Id. at 1462. Plaintiff's medications and diagnoses were unchanged from her May 11 visit. Id. at 1460-61, 1463-64.

On June 9, 2011, Plaintiff visited Dr. Gill and stated that she believed her InterStim was causing chronic pain and requested its removal. Id. at 1611. Plaintiff also stated that she was having stress incontinence. Id.

On June 28, 2011, Plaintiff visited Dr. Gill for a cystoscopy and scheduled the removal of her InterStim. Id. at 1604. That same day, Dr. Gill completed a medical source statement and checked a box reflecting that Plaintiff could not be reasonably expected to be reliable in attending an eight hour a day, forty hour work week, week after week, without missing more than two days per month in view of the degree of pain or other symptoms she experiences. Id. at 618. Dr. Gill found that Plaintiff could sit for four hours out of eight hours a day; stand for two hours out of eight hours a day; and walk for two hours out of eight hours a day. Id. Dr. Gill checked boxes reflecting that Plaintiff could lift or carry 1-5 pounds continuously, 6-10 pounds occasionally, and never more than 11 pounds. Id. Dr. Gill also checked boxes reflecting that Plaintiff could never bend, squat, or kneel; occasionally climb stairs or walk on uneven surfaces; frequently reach above her shoulders; and continuously use her hands for fine manipulation. Id. at 619. Dr. Gill found that Plaintiff had problems with stamina that would interfere with her daily activities in a work environment. Id. Dr. Gill found that Plaintiff's impairments restricted her from heights and moving machinery. Id. Dr. Gill also found that it was reasonable to expect that Plaintiff's condition would cause bladder pain and spasms. Id. at 619-20. Dr. Gill noted that Plaintiff's pain was severe and adversely affected her concentration and sleep. Id. at 620. Dr. Gill found that Plaintiff's incontinence restricted her ability

24

to perform competitive work activities. Id. Dr. Gill noted that his medical source statement was supported by objective evidence in his treatment notes and records that may not be evident on the face of his treatment notes, including medical history, physical exams, and clinical observations. Id. at 621.

On July 7, 2011, Plaintiff visited Rob Buxton at Lifecare Family Services ("LCFS") complaining of depression, significant medical issues, back problems, and marital problems. Id. at 1354. Plaintiff reported that she would "sometimes . . . stay in bed all day, ha[d] no energy and no motivation to do anything." Id. at 1355. Plaintiff was diagnosed with major depressive disorder. Id. at 1354.

On July 19, 2011, Dr. Gill performed surgery to remove Plaintiff's InterStim after explaining that removal may result in worsening of her bladder symptoms. Id. at 1225.

On August 1, 2011, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged ten out of ten. Id. at 1468. Plaintiff's medications and diagnoses were unchanged from her May 11 visit. Id. at 1460-61, 1469-70.

On August 23, 2011, Plaintiff visited Dr. Gill to follow up on the removal of her InterStim and Dr. Gill noted that she was "doing well" though she still had "significant incontinence." Id. at 1601. Dr. Gill stated that it may be reasonable for Plaintiff to consider Botox injections. Id.

On August 30, 2011, Plaintiff returned to LCFS for psychological medication management and stated that she did not believe that her medication was working to treat her anxiety, depression, and sleep trouble. Id. at 1349. Plaintiff was prescribed Prozac, buspar, and trazodone for her sleep trouble. Id. at 1349, 1351-52. Plaintiff's psychological diagnosis was unchanged from her July 7 visit. Id. at 1352, 1354.

On August 31, 2011, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged five out of ten. Id. at 1471. Plaintiff's diagnoses were unchanged from her May 11 visit but her Skelaxin was replaced with baclofen. Id. at 1460-61, 1472-73.

On September 26, 2011, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged six out of ten and that her condition was unchanged. Id. at 1474. Plaintiff complained of new pain in her thoracic spine and was observed limping more on her right hip. Id. Plaintiff requested and received a right hip injection as well as an MRI. Id. at 1474, 1477. Plaintiff's medications and diagnoses remained unchanged from her August 31 visit. Id. at 1472-73, 1475-76.

On September 29, 2011, Plaintiff returned to LCFS for psychological medication management and stated that she believed her medication was working to treat her anxiety, depression, and sleep trouble, although her medications were causing side effects. Id. at 1344. Plaintiff's psychological medications and diagnosis were unchanged from her August 30 visit except that her trazodone was replaced with amitriptyline for her sleep problems. Id. at 1346-47, 1351-52.

On October 26, 2011, Plaintiff visited Tennessee Physical Medicine and Pain Management and stated that her pain averaged five out of ten. Id. at 1478. Plaintiff's medications and diagnoses were unchanged from her August 31 visit. Id. at 1472-73, 1479-80.

On November 21, 2011, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged seven out of ten. Id. at 1481. Plaintiff complained of left thigh numbness and worsening right knee pain. Id. Plaintiff's November 9 MRI was reviewed and Plaintiff was administered a left hip injection. Id. at 1482, 1484. Plaintiff's medications and

diagnoses were unchanged from her August 31 visit. Id. at 1472-73, 1482-83.

On December 8, 2011, Plaintiff visited LCFS for psychological medication management and stated that she believed her medication was working to treat her anxiety, depression, and lack of focus. Id. at 1339. Plaintiff's psychological medications and diagnosis were unchanged from her September 29 visit. Id. at 1339-40, 1346-47.

In December 2011, January 2012, and February 2012, Plaintiff visited Tennessee Physical Medicine and Pain Management once per month. On December 21, Plaintiff stated that her pain averaged seven out of ten. Id. at 1485. On January 18, Plaintiff stated that her pain averaged five out of ten and that her condition was unchanged. Id. at 1489. Plaintiff also reported increased numbness in both legs, with more severe numbness on the right side. Id. at 1489. On February 6, Plaintiff received an epidural steroid injection without any complications. Id. at 1493. On February 15, Plaintiff rated her pain as five out of ten. Id. at 1497. Plaintiff reported that the February 6 injection alleviated the pain down her legs. Id. For all three visits, Plaintiff's medications and diagnoses were unchanged from her August 31, 2011 visit except that Plaintiff's Valium was discontinued at the February visit. Id. at 1472-73, 1487, 1491, 1498-99. On February 20, Plaintiff received another epidural steroid injection and there were not any complications. Id. at 1500.

On February 27, 2012, Plaintiff visited LCFS for psychological medication management and stated that she believed her medication was working to treat her anxiety, depression, irritability/anger, and sleep problems. Id. at 1336. Plaintiff was stable without any new concerns. Id. Plaintiff's psychological medications were unchanged from her September 29, 2011 visit. Id. at 1336-37, 1346-47.

On March 8, 2012, Plaintiff underwent a "lumbar medial branch block, for diagnostic and therapeutic purposes, as part of an ongoing conservative management program for her" lower back pain. Id. at 1504.

In March and April 2012, Plaintiff visited Tennessee Physical Medicine and Pain Management once per month. On March 14, Plaintiff stated that her pain averaged five out of ten. Id. at 1508. Plaintiff stated that the March 8 procedure helped and that she was able to lay on her right hip/side. Id. On April 11, Plaintiff stated that her pain averaged six out of ten. Id. at 1511. For both visits, Plaintiff's medications and diagnoses were unchanged from her February 15 visit. Id. at 1498-99, 1509-10, 1512-13.

On April 23, 2012, Plaintiff visited LCFS for psychological medication management and stated that she believed her medication was working to treat her anxiety, depression, irritability/anger, and sleep problems. Id. at 1336. Plaintiff was stable with depression and insomnia. Id. at 1333. Plaintiff's psychological medications were unchanged from her September 29, 2011 visit. Id. at 1333-34, 1346-47.

On April 26, 2012, Plaintiff underwent an "L3, L4, and L5 medial branch radiofrequency neurolysis, as part of an ongoing conservative management program for" Plaintiff's lower back pain. Id. at 1514.

On May 9, 2012, Plaintiff visited Tennessee Physical Medicine and Pain Management and stated that her pain averaged six out of ten and that her condition was unchanged. Id. at 1516. Plaintiff's medications and diagnoses were unchanged from her February 15 visit. Id. at 1498-99, 1517-18.

On May 21, 2012, Plaintiff underwent another "lumbar medial branch block, for diagnostic

28

and therapeutic purposes, as part of an ongoing conservative management program for her" lower back pain. Id. at 1519.

On May 23, 2012, Plaintiff presented to University Medical Center complaining of cough, chest pain, and pain while moving or breathing. Id. at 1582. Plaintiff underwent medical imaging that did not reveal any pulmonary embolus, aortic dissection, or acute cardiopulmonary disease. Id. at 1587, 1589. The diagnosis was acute bronchitis and Plaintiff left against medical advice on May 24. Id. at 1575.

On June 6, 2012, Plaintiff visited Tennessee Physical Medicine and Pain Management and stated that her pain averaged six out of ten. Id. at 1525. Plaintiff reported that her leg pain had increased and that she was having difficulty walking, although the May 21 procedure helped "some on the right side." Id. Plaintiff's medications and diagnoses were unchanged from her February 15 visit. Id. at 1498-99, 1526-27.

On June 18, 2012, Plaintiff underwent another "L3, L4, and L5 medial branch radiofrequency neurolysis, as part of an ongoing conservative management program for" Plaintiff's lower back pain. Id. at 1528.

On July 5, 2012, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged seven out of ten and that her condition was unchanged. Id. at 1536. Plaintiff's medications and diagnoses were unchanged from her February 15 visit except that her morphine was replaced with Opana. Id. at 1498-99, 1537-38.

On a July 18, 2012 disability report, Plaintiff stated that problems with her back, knee, hands, arm, and wrist limited her ability to work and caused her pain. Id. at 1107.

On July 18, 2012, Plaintiff visited LCFS for psychological medication management and

stated that she did not believe that her medication was working to treat her anxiety, depression, and sleep problems. Id. at 1330. Plaintiff complained of sleep problems, fatigue, anxiety, and stress. Id. Plaintiff's psychological medications were unchanged from her September 29, 2011 visit. Id. at 1331, 1346-47.

On August 2, 2012, Plaintiff visited Tennessee Physical Medicine and Pain Management and stated that her pain averaged seven out of ten and that her condition was unchanged. Id. at 1540. Plaintiff wanted to discuss her medications and reported that she hurt more during the previous month than ever, and that her pain radiated down her legs to her toes. Id. Plaintiff's medications and diagnoses were unchanged from her July 5 visit except that her Baclofen was replaced with Flexeril was added. Id. at 1537-38, 1541-42.

On an August 9, 2012 pain questionnaire, Plaintiff stated that she had constant and worsening pain in her mid-back, hips, buttocks, and down to her toes. Id. at 1128. Plaintiff stated that the pain was brought on by sitting, standing, walking too long, or lying down. Id. Plaintiff noted that her medications made her pain more bearable, but did not completely relieve her pain, and yielded side effects of constipation, dry mouth, dizziness, drowsiness, and occasional blurred vision. Id. Plaintiff stated that she no longer used any devices to relieve her pain. Id. at 1129. Plaintiff stated that she rarely drove or socialized, did light housework, and rested periodically throughout the day. Id.

That same day, Plaintiff completed a function report and stated that her ability to work was limited by her inability to walk, sit, or stand without frequent breaks. Id. at 1132. Plaintiff noted that she was unable to lift, push, pull, or reach. Id. Plaintiff reported that she prepared simple meals did light housework with some assistance. Id. at 1134. Plaintiff stated that she did not like to leave her house alone and rarely drove because of her medications. Id. at 1135. Plaintiff also stated that she

30

shopped for groceries or household supplies "maybe once a week." Id. Plaintiff stated that she "stay[ed] to [her]self most of the time." Id. at 1137. Plaintiff checked boxes reflecting that she had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, remembering, completing tasks, concentrating, using hands, and getting along with others. Id. Plaintiff reported that she did not handle changes in routine well and that her medications helped her manage stress. Id. at 1138.

On August 30, 2012, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged seven out of ten and that her condition was unchanged. Id. at 1544. Plaintiff's medications and diagnoses were unchanged from her August 2 visit. Id. at 1541-42, 1544-45.

On September 4, 2012, Dr. Roy Johnson, a consultative examiner, examined Plaintiff and reviewed her medical records as part of the disability determination and diagnosed her with low back syndrome; status post hysterectomy with urinary bladder incontinence; sleep disorders including sleep walking; status post left knee surgery; possible cumulative trauma disorder to both hands; hypertension; and acid reflux disorder. Id. at 1359. Dr. Johnson found that Plaintiff could occasionally lift fifteen pounds and could stand and walk for two hours of an eight-hour day with normal breaks. Id. at 1360. Dr. Johnson also found that Plaintiff's "work activity should not exceed any restrictions placed on her by her treating physician." Id.

On September 20, 2012, Plaintiff visited LCFS for psychological medication management and stated that she did not believe that her medication was working to treat her anxiety, depression, and sleep problems. Id. at 1773. The office note reflects that Plaintiff was "fairly stable" and had "probable sleep apnea." Id. at 1773-74.

On September 27, 2012, Plaintiff visited Tennessee Physical Medicine and Pain Management and stated that her pain averaged eight out of ten. Id. at 1546. Plaintiff reported that she was experiencing "a lot of trouble with her lower back going in to buttocks going down her legs." Id. Plaintiff's medications and diagnoses were unchanged from her August 2 visit. Id. at 1541-42, 1548.

On October 3, 2012, Dr. James Millis, a consultant, completed a Physical RFC Assessment as part of the disability determination and found that Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for two hours in an eight-hour work day; and sit for about six hours in an eight-hour work day. Id. at 1367. Dr. Millis also found that Plaintiff was limited in pushing/pulling with the lower extremities due to back pain, including frequent use of foot controls. Id. Dr. Millis stated that Plaintiff had occasional limitations balancing, stooping, kneeling, crouching, crawling, and climbing stairs, ladder, rope, and scaffolds. Id. at 1368. As to Plaintiff's reported "excessive sleepiness," Dr. Millis opined that there was "no evidence in the file to support this claim and no record that [] she reported this to [treating physician]." Id. at 1373. Dr. Millis concluded that Plaintiff was only "partially credible as the sleepiness and severe restrictions of mobility are not supported in the" medical record. Id.

On October 15, 2012, Dr. Linda Blazina completed a mental status examination of Plaintiff as part of the disability determination and made mental diagnoses of depressive disorder, panic disorder without agoraphobia, "rule out cognitive disorder NOS," and noted that Plaintiff "appear[ed] to have limited stress tolerance." Id. at 1381. As to Plaintiff's ability to understand, remember, and carry out instructions, Dr. Blazina found that Plaintiff did not have any limitations regarding simple instructions, but that she was moderately limited regarding complex detailed instructions. Id. Dr. Blazina found that Plaintiff was moderately impaired in her ability to sustain

concentration, attention, and persistence due to anxiety; mildly to moderately impaired in her ability to interact socially, including with coworkers and the general public, due to anxiety, depression, and Plaintiff's self-report that she "tends to avoid people and is sometimes irritable"; and moderately impaired in her ability to adapt to change in a work routine and cope with normal workplace stress due to anxiety and depression. Id. As to activities of daily living, Plaintiff reported that she could groom herself, do light housework, manage money, prepare some meals, and shop with assistance, though she "had fallen sleep in her truck in the parking low of a store at one point . . . ." Id. at 1380. As to social activities, Plaintiff reported that she saw her family and some neighbors, but that she did not have any close friends and avoided people. Id.

On October 19, 2012, Dr. Joslin completed a Medical Consultant Analysis and found that Plaintiff's medical condition had not significantly changed since the prior ALJ's 2011 decision due to continued moderate limitations. Id. at 1385. Dr. Joslin opined that Plaintiff's report of symptoms was credible and gave great weight to Dr. Blazina's October 15 mental status examination. Id. at 1387. Dr. Joslin performed a Psychiatric Review Technique and concluded that Plaintiff's cognitive disorder, depression, and panic disorder resulted in mild restrictions in Plaintiff's activities of daily living; moderate limitations in maintaining social functioning; and moderate limitations in maintaining concentration, persistence, or pace. Id. at 1390-1400. Dr. Joslin completed a Mental RFC Assessment and found that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting

behavioral extremes; and respond appropriately to changes in the work setting. Id. Dr. Joslin also found that Plaintiff was markedly limited in her ability to interact appropriately with the general public. Id.

That same day, examiner Robert Reasonover completed a vocational analysis and found that Plaintiff could: lift a maximum of twenty pounds, or ten pounds frequently; stand or walk for two hours per day; sit for six hours per day; and frequently engage in light pushing or pulling with her legs. Id. at 1140. Plaintiff had occasional limitations balancing, stooping, kneeling, crouching, crawling, and climbing ramp, stairs, ladder, rope, and scaffolds. Id. Reasonover repeated the findings of Dr. Joslin's Mental RFC Assessment. Id. Reasonover completed a "Drummond and Dennard Acquiescence Rulings Rationale" and found that new evidence obtained was not material to the prior ALJ's decision because "no significant change has occurred." Id. at 1144.

On October 25, 2012, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged eight out of ten and that her condition was unchanged. Id. at 1550. Plaintiff reported that sharp burning pain in her lumbar spine radiated down to her feet and that it hurt to sit. Id. Plaintiff's medications and diagnoses were unchanged from her August 2 visit. Id. at 1541-42, 1552-53.

On November 1, 2012, Plaintiff visited LCFS for psychological medication management and stated that she did not believe that her medication was working to treat her anxiety, depression, and sleep problems. Id. at 1770. Plaintiff reported that she did not have any side effects from her medications and had been sleepwalking for the past year. Id.

On November 21, 2012, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged eight out of ten. Id. at 1554. Plaintiff reported that she

had increased pain in her "left sciatic/hip" that radiated down her left leg and stated that she had fallen after her legs "g[a]ve way." Id. Plaintiff's medications and diagnoses were unchanged from her August 2 visit except that her Flexeril was replaced with Zanaflex and Medrol. Id. at 1541-42, 1555-56.

On December 27, 2012, Plaintiff returned to LCFS for psychological medication management and stated that she did not believe that her medication was working to treat her anxiety, depression, and sleep problems. Id. at 1767. Plaintiff reported that her medication improved her sleep, but that she still experienced some sleepwalking. Id.

On January 14, 2013, Plaintiff completed a disability report on appeal, stating that she started experiencing more severe back pain in October 2012. Id. at 1148. Plaintiff reported that she could "only sit, stand, or lie for short periods of time" and required frequent assistance from her husband. Id. Plaintiff also stated that she had severe insomnia and sleepwalking problems. Id.

On January 16, 2013, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged nine out of ten. Id. at 1557. Plaintiff's medications and diagnoses were unchanged from her November 21, 2012 visit except that her Medrol was removed. Id. at 1555-56, 1558-59.

On January 30, 2013, Plaintiff visited LCFS for psychological medication management and stated that she did not believe that her medication was working to treat her anxiety, depression, and sleep problems. Id. at 1764. Plaintiff reported that she was still sleepwalking, though she had experienced some improvement. Id.

On February 7, 2013, Plaintiff received another epidural steroid injection and there were not any complications. Id. at 1687.

On February 13, 2013, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged six out of ten. Id. at 1682. Plaintiff stated that her recent injection helped reduce her pain. Id. Plaintiff's medications and diagnoses were unchanged from her January 16 visit. Id. at 1558-59, 1683-84.

On February 25, 2013, Dr. Amin Azimi completed case analysis, reviewed all of the evidence in Plaintiff's disability file, and affirmed Dr. Joslin's October 2012 Mental RFC Assessment. Id. at 1561.

On March 7, 2013, Dr. Carolyn Parrish completed a Physical RFC Assessment and found that Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for two hours in an eight-hour work day; and sit for about six hours in an eight-hour work day. Id. at 1563. Dr. Parrish stated that Plaintiff had occasional limitations balancing, stooping, kneeling, crouching, crawling, and climbing stairs, ladder, rope, and scaffolds. Id. at 1564. Dr. Parrish opined that "additional information in [Plaintiff's] file does not change the decision of the previous assessment." Id. at 1569.

In a March 10, 2013 case analysis, Dr. Parrish opined that there was insufficient information in Plaintiff's file to assess Plaintiff's allegations from her alleged onset date of January 1, 2008, through her date last insured of December 31, 2012. Id. at 1572. In a March 11 case analysis, Dr. Azimi similarly opined that there was insufficient information to assess Plaintiff's mental assessments from her alleged onset date of January 1, 2008, through her date last insured of December 31, 2012. Id. at 1573.

On March 13, 2013, Plaintiff visited Tennessee Physical Medicine and Pain Management and stated that her pain averaged six out of ten. Id. at 1678. Plaintiff's medications and diagnoses were

unchanged from her January 16 visit. Id. at 1558-59, 1678-79. That same day, Plaintiff returned to LCFS for psychological medication management and stated that she believed that her medication was working to treat her anxiety and depression. Id. at 1761. Plaintiff reported that she either did not sleep or sleepwalked. Id. at 1762. Plaintiff began taking the medication Mirtazapine. Id.

On April 10, 2013, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged six out of ten. Id. at 1838. Plaintiff's medications and diagnoses were unchanged from her January 16 visit except that her Zanaflex was replaced with Skelaxin and her diagnosis for "post-laminectomy/fusion syndrome of lumbar region" was replaced with "spasm of muscle." Id. at 1558-59, 1840-41. On April 22, Plaintiff received another epidural steroid injection and there were not any complications. Id. at 1833. On April 24, Plaintiff returned to LCFS for psychological medication management and stated that she believed that her medication was working to treat her anxiety and depression. Id. at 1758. Plaintiff reported that she "fe[lt] better and [was] doing well," and that she had not had a sleepwalking episode since switching medication. Id. at 1759.

On May 8, 2013, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged six out of ten. Id. at 1825. Plaintiff reported that her most recent injection helped reduce her pain "at least [] 50%" and that her sleep had improved. Id. at 1826. Plaintiff stated that her medication allowed her to engage in basic activities of daily living and have a better quality of life. Id. Plaintiff's medications and diagnoses were unchanged from her April 10 visit. Id. at 1825-26, 1840-41.

On May 10, 2013, Plaintiff completed another disability report for her appeal and reported that her condition had not changed since January 2013. Id. at 1156.

On June 5, 2013, Plaintiff visited LCFS for psychological medication management and stated

37

that she believed that her medication was working to treat her anxiety and depression. Id. at 1755. Plaintiff reported that she was experiencing insomnia though she had not experienced sleepwalking episodes since switching medication. Id. at 1756. Seroquel was added to Plaintiff's medications. Id. at 1756.

On June 6, 2013, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged five out of ten and that her condition was unchanged. Id. at 1820. Plaintiff stated that she had bladder issues that required wearing Depends and that she had a "bladder stim" that did not work. Id. at 1822. Plaintiff reported that "Dr. Gill talked to her about Botox for her bladder." Id. Plaintiff's medications and diagnoses were unchanged from her April 10 visit. Id. at 1822-23, 1840-41.

On June 26, Plaintiff returned to LCFS for psychological medication management and stated that she believed that her medication was working to treat her anxiety and depression. Id. at 1752. Plaintiff reported that her new medication was very helpful for her insomnia. Id. at 1753. Plaintiff's's medications were unchanged from her June 3 visit. Id. at 1752, 1755.

On July 3, 2013, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged five out of ten. Id. at 1817. The office note reflects that Plaintiff suffered from continued radicular pain and urinary incontinence. Id. at 1818. Plaintiff stated that steroid injections were very helpful and that her medication improved her functionality without side effects. Id. Plaintiff's diagnoses were unchanged from her April 10 visit except that her diagnosis of "post-laminectomy/fusion syndrome of lumbar region" was added and the only medications refilled were Duragesic and Opana. Id. at 1818-19, 1840-41.

On August 1, 2013, Plaintiff returned to Tennessee Physical Medicine and Pain Management

and stated that her pain averaged five out of ten. Id. at 1814. Plaintiff stated that "today is a good day" and that her medications improved her pain by "60-70%" and allowed her to do activities of daily living including light housework. Id. at 1815. Plaintiff's diagnoses were unchanged from her July 3 visit and her medications were listed as Duragesic, Mobic, Neurontin, Opana, Senokot, and Skelaxin. Id. at 1815-16, 1818.

On August 15, 2013, Plaintiff visited LCFS for psychological medication management and stated that she believed that her medication was working to treat her anxiety and depression. Id. at 1748. Plaintiff's medications were listed as Prozac, mirtazapine, seroquel, and buspirone. Id. at 1749.

In August and September 2013, Plaintiff visited Tennessee Physical Medicine and Pain Management once per month. On August 29, Plaintiff stated that her pain averaged six out of ten and that her condition was unchanged. Id. at 1805. Plaintiff's diagnoses were unchanged from her August 1 visit and Cymbalta was added to her medications. Id. at 1806-07, 1815-16. On September 26, Plaintiff stated that her pain averaged six out of ten, that her condition was unchanged, and that she was doing well on her medications. Id. at 1802, 1804. Plaintiff's diagnoses were unchanged from her August 1 visit and her only medications refilled were Opana and Duragesic. Id. at 1803-04, 1815.

On October 21, 2013, Plaintiff returned to LCFS for psychological medication management and stated that she believed that her medication was working to treat her anxiety and depression. Id. at 1745. Plaintiff reported that she had recently been babysitting a young neighborhood child, which made her happy because she loved children. Id. at 1746. Plaintiff noted that she recently had several urinary tract infections and two abnormal pap smears. Id. Plaintiff's medications were listed as Prozac, mirtazapine, seroquel, and buspirone. Id. at 1746.

On October 24, 2013, Plaintiff returned to Tennessee Physical Medicine and Pain

39

Management and stated that her pain averaged eight out of ten and that her condition was unchanged. Id. at 1799. Plaintiff stated that she was not tolerating the recent "weaning down" of her pain medication. Id. at 1801. Plaintiff's diagnoses were unchanged from her August 1 visit and her refilled medications were morphine sulphate and Opana. Id. at 1800-01, 1815.

On November 22, 2013, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged eight out of ten and that she was "doing ok" with her reduced dosage of pain medication. Id. at 1790, 1792. Plaintiff's diagnoses were unchanged from her August 1 visit and her refilled medications were morphine and morphine sulphate. Id. at 1788-89, 1815.

On December 20, 2013, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged five out of ten. Id. at 1787. The office note reflects that Plaintiff "[d]id well with reduction, we have reduced over half her meds; [Plaintiff] tolerated well; pain is well controlled." Id. at 1788-89. Plaintiff's diagnoses were unchanged from her August 1 visit and her refilled medications were morphine, Cymbalta, Mobic, morphine sulphate, Neurontin, Senokot, and Skelaxin. Id. at 1791-92, 1815.

On January 15, 2014, Dr. Baker completed a medical source statement and checked boxes reflecting that Plaintiff could occasionally and frequently lift ten pounds; stand and/or walk for at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and push and/or pull ten pounds with her upper and lower extremities. Id. at 1776-77. Dr. Baker noted that these limitations were supported by his records. Id. at 1777. Dr. Baker also checked boxes reflecting that Plaintiff could occasionally stoop and climb ramps, stairs, ladders, ropes, and scaffolds, but could never balance, kneel, crouch, or crawl. Id. Dr. Baker explained that Plaintiff's lower extremity

40

weakness and numbness made it unsafe for her to climb ladders, and that doing so would risk injury and exacerbation of pain to perform other tasks. Id. Dr. Baker found that Plaintiff was limited to frequently reaching all directions, occasionally handing (gross manipulation), occasionally fingering (fine manipulation), and frequently feeling (skin receptors). Id. at 1778. Dr. Baker explained that Plaintiff was unable to perform tasks safely due to lumbar fusion surgery with chronic radiculopathy and severe pain, and that further injury may "result in the need for more surgery or possible permanent disability." Id.

On January 17, 2014, Plaintiff returned to Tennessee Physical Medicine and Pain Management and stated that her pain averaged five out of ten and that her condition was unchanged. Id. at 1782. Plaintiff reported that she was doing well on her medications, but complained of increased radicular symptoms and requested another steroid injection to treat her pain. Id. at 1783. Plaintiff's diagnoses were unchanged from her August 1 visit and her refilled medications were Zanaflex, morphine, and morphine sulphate. Id. at 1783-84, 1815.

At the January 27, 2014 hearing before the ALJ, Plaintiff testified that she experienced pain, weakness, and spasms in her legs and back. Id. at 905-06. Plaintiff stated that she received a number of injections following her back fusion surgery that provided pain relief for "a few weeks." Id. at 907-08. Plaintiff stated that her medications—"three forms of morphine," Neurotonin, Mobic, Cymbalta, "Scolactin," and Zanaflex—caused memory issues. Id. at 906. Plaintiff explained that Dr. Baker treated her back pain, prescribed her medications, and administered her injections. Id. at 910. Plaintiff stated that depression affected her daily, though some days were worse than others. Id. at 911. Plaintiff also stated that her pain, depression, and anxiety caused her difficulty sleeping and led to her sleepwalking for a time. Id. at 908-09. Plaintiff reported that she took the medications

Remeron and Seroquel for these sleep problems. Id. at 909.

Plaintiff testified that she walked slowly with a limp, could sit comfortably for 30-45 minutes, and could stand for 30-60 minutes. Id. at 907. Plaintiff stated that she spent 3-4 hours per day lying down. Id. Plaintiff testified that her husband and neighbor helped her around the house every day. Id. at 908. Plaintiff explained that she watched a four-year-old neighborhood child for "several days throughout a two-week span" while her neighbor was there to help and Plaintiff did not receive payment. Id. at 913-15. As to bladder issues, Plaintiff testified that she had "permanent nerve damage" and "no control whatsoever of [her] bladder." Id. at 909. Plaintiff estimated that she had accidents "once to twice a day" and went to the restroom "15, 20, times or plus a day." Id. at 910. Plaintiff explained that Dr. Gill treated her bladder problems, but the only thing he could do was prescribe her diapers that she wore when lying down during the day and night. Id. at 909-910. The ALJ noted that, according to Plaintiff's medical record, Plaintiff last visited Dr. Gill in August 2011, but Plaintiff stated that she had seen him since then. Id. at 911-12.

The ALJ asked vocational expert Kenneth Anchor whether an individual of Plaintiff's age, education, work experience, and RFC level could perform any jobs that exist in the national economy. Id. at 916-17. Anchor testified that Plaintiff could not perform her past relevant work as a certified nurse assistant or customer service representative. Id. Anchor stated, however, that Plaintiff could perform other jobs that exist in the national economy, such as assembler, table worker, and egg processor. Id. at 917-18.

### B. Conclusions of Law

The Social Security Act defines "disability" as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

42

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1); see also 42 U.S.C. § 1382c(a)(3). A reviewing court's evaluation of the Commissioner's decision is based upon the entire record made from the administrative hearing process. Jones v. Sec'y, Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). Judicial review is limited to a determination of (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health and Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

Plaintiff contends that the ALJ erred by: (1) improperly analyzing and providing inadequate weight to the opinions of Dr. Baker; (2) improperly analyzing and providing inadequate weight to the opinion of Dr. Gill; and (3) making erroneous findings regarding Plaintiff's urinary incontinence and failing to properly account for this impairment in the RFC assessment.

Plaintiff first argues that Dr. Baker was her treating physician and provided three medical source statements that constitute substantial evidence supporting Plaintiff's claim for disability. (Docket Entry No. 15 at 12). Plaintiff contends that "the ALJ failed to sufficiently consider Dr. Baker's opinions and made clearly erroneous findings based upon mischaracterizations and/or

misrepresentations of the evidence." Id. at 14. The Commissioner contends that "the ALJ properly evaluated all three opinions from Dr. Baker . . . ." (Docket Entry No. 16 at 4).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" Gayheart v. Comm'r of Soc. Sec., 710 F.3d 365, 376 (6th Cir. 2014) (quoting 20 C.F.R. § 404.1527(c)(2)). If the ALJ does not assign the treating physician's opinion "controlling weight," the ALJ must still assign it appropriate weight based on a number of factors, including: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 406 (6th Cir. 2009) (internal citations omitted). The ALJ must also provide "good reasons" for discounting the opinion that are "supported by the evidence in the case record" and "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Id. at 406-07 (internal quotations and citations omitted). The Commissioner does not dispute that Dr. Baker and Dr. Gill qualify as Plaintiff's treating physicians.

Here, Dr. Baker completed medical source statements on February 5, 2009; April 11, 2011; and January 15, 2014. The ALJ summarized the findings of each statement and assigned them only limited weight due to unexplained inconsistencies between Dr. Baker's statements and his treatment notes. (Docket Entry No. 10 at 885-86).

In his February 2009 statement, Dr. Baker concluded that Plaintiff could occasionally lift up

to ten pounds, never carry up to ten pounds, and could sit, stand, or walk for thirty minutes without interruption. Id. at 409-10. Dr. Baker found that, in an eight-hour work day, Plaintiff could sit or stand for three hours and walk for two hours. Id. at 410. Dr. Baker also found that Plaintiff could never balance and occasionally handle and finger. Id. at 411. The ALJ specifically discussed Dr. Baker's February 2009 statement and found that the statement was not properly supported and inconsistent with the record as a whole:

> In his explanatory notes, Dr. Baker indicated that the claimant has "bowel and bladder issues.., decreased lumbar ROM.. and exquisite tenderness..." While the claimant has consistently reported, "trouble with urination" as already discussed above, to Dr. Baker, there is no mention in his treatment notes of any bowel issue. Virtually every treatment note by Dr. Baker states that, "lumbosacral range of motion is within normal limits." While the claimant had consistently been noted to be tender on palpitation of spine, her tenderness has never been described as "severe or exquisite."

Id. at 881 (internal citations omitted).

The ALJ did not err in concluding that Dr. Baker's February 2009 statement was not properly supported. From Plaintiff's alleged onset date in January 2008 through Dr. Baker's February 2009 statement, Plaintiff made monthly visits to Tennessee Physical Medicine and Pain Management where she was under the care of Dr. Baker. Treatment notes from these visits do not reference bowel issues. Id. at 377-92, 442-49, 465-66, 469-70. Despite Dr. Baker's citation to "exquisite tenderness over [Plaintiff's] lumbar midline and paraspinals," Dr. Baker's fourteen treatment notes from this period reflect something less severe by stating: "On palpitation she is tender in the gluteals, lumbar midline, lumbar paraspinals and trochanteric bursa." Id. Further, Dr. Baker's six treatment notes immediately preceding his February 2009 statement reflect that Plaintiff's lumbosacral range of motion was within normal limits. Id. at 377-80, 442-49.

In his April 2011 statement, Dr. Baker checked boxes reflecting that Plaintiff could lift or carry 1-5 pounds continuously, 6-10 pounds frequently, 11-20 pounds occasionally, and never more than 21 pounds. Id. at 614. Dr. Baker found that, in an eight-hour day, Plaintiff could sit for four hours, stand with breaks for two hours, and walk with breaks for two hours. Id. Dr. Baker found that Plaintiff required one hour of daily bed rest and could not be reasonably expected to reliably attend a full-time job without missing more than two days per month due to her pain and other symptoms. Id. at 614-15. Dr. Baker noted that Plaintiff needed to elevate her legs five times per day for one-to-two hours. Id. at 616. Dr. Baker found that Plaintiff's pain was severe and adversely affected her concentration and sleep, and that the side effects of Plaintiff's medications could adversely affect her concentration. Id. at 615-16.

In his January 2014 statement, Dr. Baker checked boxes reflecting that Plaintiff could lift, carry, push, and/or pull ten pounds, as well as sit for about six hours and stand and/or walk for at least two hours in an eight-hour workday. Id. at 1776-77. Dr. Baker also checked boxes reflecting that Plaintiff could occasionally stoop and climb ramps, stairs, ladders, ropes, and scaffolds, but could never balance, kneel, crouch, or crawl. Id. at 1777. Dr. Baker found that Plaintiff had manipulative limitations due to her "lumbar fusion surgery with chronic radiculopathy and severe pain." Id. at 1778.

The ALJ summarized Dr. Baker's three medical source statements and gave them limited weight because they were inconsistent with his treatment notes:

> First, I note the wide and unexplained variance between the three statements and his treatment records. Dr. Baker's office notes indicate that the claimant is seen every month, primarily to obtain refills for narcotic pain medications. Virtually every office note states that claimant's pain is adequately controlled. The note on May 8, 2013 is more expansive stating: "States pain regimen definitely helps, allows her to function,

doing basic ADL's, walk and have a better quality of life. Pt states before medication she could not function, now she can with medication. She remains active. Continue HEP. Pt is happy with her current medication which allows her to function and have a better quality of life." Dr. Baker's treatment records are not consistent with some of his opinions indicating that claimant could not perform even sedentary work.

Id. at 885-86 (internal citations omitted).

Plaintiff argues that the ALJ did not evaluate Dr. Baker's opinions using the required regulatory factors, specifically stating the ALJ did not consider the "nature, length, or frequency of the treatment relationship between Dr. Baker and Plaintiff." (Docket Entry No. 15 at 15). Referring to the ALJ's quotation of Dr. Baker's May 2013 treatment note, Plaintiff states that the ALJ's analysis cites only "one treatment note among the voluminous treatment notes from Dr. Baker over approximately seven (7) years . . . ." Id. at 14. Because an ALJ may consider the required regulatory factors without explicitly naming them, Plaintiff's contention lacks merit.

An ALJ need not articulate a factor-by-factor analysis of a non-controlling treating source opinion as long as the ALJ actually considers the listed factors and provides "good reasons" for the weight given to the opinion. Hatmaker v. Comm'r of Soc. Sec., 965 F.Supp.2d 917, 927 (E.D.Tenn. 2013) (citing Francis v. Comm'r of Soc. Sec., 414 F.App'x 802, 804 (6th Cir. 2011)). Here, the ALJ's opinion reflects that he considered the length and nature of Dr. Baker's treatment relationship with Plaintiff as well as the frequency of examination, as required by Social Security Regulations. See 20 C.F.R. §§ 404.1527(c)(2)(I), 416.927(c)(2)(I). The ALJ explicitly considered the nature and frequency of Plaintiff's visits with Dr. Baker by noting that Plaintiff was "seen every month, primarily to obtain refills for narcotic pain medications." (Docket Entry No. 10 at 886). As to the length of treatment, the ALJ referred to "[v]irtually every office note stat[ing] that claimant's pain

is adequately controlled." (Docket Entry No. 10 at 886). In his chronological consideration of Plaintiff's record, the ALJ summarized at least twenty-five specific treatment notes from Plaintiff's visits to Dr. Baker's office beginning with Plaintiff's alleged onset date in January 2008 through her hearing before the ALJ in January 2014. Id. at 880-84. The ALJ also considered many more treatment notes without specifically summarizing them by referring to a range of dates, including: May 2009 through November 2009 ("For the next several months, the claimant reported that she was still having low back pain and said it was getting worse."); and July 2010 through December 2010 ("[Dr. Baker's] records show [Plaintiff's] pain as adequately controlled through the end of 2010."). Id. at 882. Thus, the ALJ did not err by failing to consider the required regulatory factors in his analysis of Dr. Baker's opinions.

Plaintiff also argues that the ALJ misrepresented Dr. Baker's treatment notes by ignoring sections of the treatment notes reflecting the severity of Plaintiff's pain. (Docket Entry No. 15 at 14). As Plaintiff states, "while many of [Dr. Baker's] treatment notes do state that Plaintiff's pain is adequately controlled in the introduction portion of the notes, nearly all of these same notes state that she is in nearly constant pain rated as a seven (7) or higher on the scale of ten (10)." Id. The Court concludes that substantial evidence in the record as a whole supports the ALJ's decision to assign little weight to Dr. Baker's three medical source statements.

The record reflects that Plaintiff visited Dr. Baker almost every month from her alleged onset date in January 2008 through her hearing before the ALJ in January 2014, including sixty-seven treatment notes.[2] (Docket Entry No. 10 at 440-66, 469-70, 575-90, 768-91, 798-800, 1459-76, 1478-

---

[2]The Court considers Dr. Baker's "treatment notes" to include "progress notes" and "quick notes." The record reflects treatment notes for every month during this period except

48

83, 1485-92, 1497-99, 1508-1513, 1516-18, 1525-27, 1536-59, 1678-79, 1682-84, 1782-84, 1787-93, 1799-1808, 1814-27, 1838-42). Every treatment note from March 2010 onward—forty-four total—reflects that Plaintiff's pain was adequately controlled. Id. at 768-91, 798-800, 1459-76, 1478-83, 1485-92, 1497-99, 1508-1513, 1516-18, 1525-27, 1536-59, 1678-79, 1682-84, 1782-84, 1787-93, 1799-1808, 1814-27, 1838-42. Although Plaintiff correctly notes that "nearly all of these same notes state that [Plaintiff] is in nearly constant pain rated as a seven (7) or higher on the scale of ten (10)," (Docket Entry No. 15 at 14), the most recent treatment notes generally reflect a lower pain rating. Eleven of thirteen treatment notes from February 2013 through January 2014 reflect pain ratings of five or six. (Docket Entry No. 10 at 1678-79, 1682-84, 1782-84, 1787-93, 1799-1808, 1814-27, 1838-42). Plaintiff's argument that the ALJ "failed to note" that Plaintiff's neighbor provided her regular assistance with daily activities is also mistaken, as shown by the ALJ's summary of Plaintiff's December 2013 treatment note: "[A]s of December 20, 2013, [Plaintiff] reported her medications improved her pain 60-70 percent, allowing her to do her activities of daily living with some help from her neighbor." Id. at 884.

Additionally, the ALJ did not treat all three of Dr. Baker's statements equally, as he incorporated aspects of Dr. Baker's most recent medical source statement in his RFC assessment. As the ALJ stated, "my RFC finding is largely consistent with Dr. Baker's . . . January 15, 2014 statement." Id. at 885. Just as Dr. Baker limited Plaintiff to occasionally and frequently lifting or

_____

April 2009, June 2009, December 2009, January 2010, April and May 2010, September 2010, December 2010, February 2011, and December 2012. Although Plaintiff visited Dr. Baker to receive injections and medication refills in April and May 2010, these visits generated "procedure notes" that did not document any physical examination of Plaintiff. (Docket Entry No. 10 at 794-97).

carrying ten pounds, the ALJ limited Plaintiff to sedentary work that the regulations define as work involving "lifting no more than 10 pounds at a time and occasionally lifting or carrying . . . ." 20 C.F.R. §§ 404.1567(a), 416.967(a); (Docket Entry No. 10 at 879, 1776). Dr. Baker found that Plaintiff could sit for about six hours and stand and/or walk for at least two hours with normal breaks, while the ALJ limited Plaintiff to alternating sitting and standing every hour. (Docket Entry No. 10 at 879, 1776-77). Both Dr. Baker and the ALJ found pushing/pulling limitations in Plaintiff's lower extremities, and their findings as to Plaintiff's postural limitations were also similar. Id. at 879, 1777-78. Thus, substantial evidence in the record supports the ALJ's analysis of Dr. Baker's medical source statements. See Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 547 (6th Cir. 2004) ("[I]f the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion . . . .").

Plaintiff also argues that the ALJ failed to address a significant aspect of Dr. Roy Johnson's findings that supports Dr. Baker's statements. (Docket Entry No. 15 at 16). Dr. Johnson—a consultative examiner for the SSA—examined Plaintiff on November 26, 2008 and September 14, 2012, and both times included in his medical assessment of Plaintiff's ability to perform work-related activities the statement that "[Plaintiff's] work activity should not exceed any restrictions placed on her by her treating physician." (Docket Entry No. 10 at 399, 1360). The ALJ "note[d]" Dr. Johnson's opinions among a group of "multiple State agency medical consultant and consultative examiners" and "agree[d] with those sources that [Plaintiff] cannot meet the standing and walking requirements of light work." Id. at 886.

50

Plaintiff is correct that the ALJ's summaries of Dr. Johnson's findings did not include Dr. Johnson's note of deference to an unspecified treating physician. Id. at 881, 883. Yet, the ALJ was not required to address every aspect of Dr. Johnson's findings in his opinion and Dr. Johnson's "unsupported, non-medical disclaimer" does not bind the ALJ's analysis of Plaintiff's disability. See Burns v. Colvin, No. 3:12-cv-00808, 2013 WL 6827944, at *11 (M.D. Tenn. Dec. 30, 2013) (adopting a report and recommendation that found a plaintiff's similar argument regarding Dr. Johnson's identical statement of deference to a treating physician in another consultative examination to be "frivolous inasmuch as it suggests that an unsupported, non-medical disclaimer of a consulting physician binds the SSA to that disclaimer, in essence superceding the SSA's authority and the 'substantial evidence' standard which guides subsequent judicial review"). The ALJ concluded that Dr. Baker's three statements were not properly supported and inconsistent with the record as a whole, and that conclusion is supported by substantial evidence. Thus, it was not error for the ALJ to omit Dr. Johnson's note of deference to an unspecified treating physician from his analysis.

The ALJ consulted Dr. Baker's treatment notes, considered the required regulatory factors, and gave more weight to Dr. Baker's most recent medical source statement. The Court concludes that the ALJ's analysis of Dr. Baker's opinions is supported by substantial evidence.

Plaintiff's second and third contentions relate to the ALJ's analysis of her urinary impairment. Plaintiff argument is two-fold: first, that the ALJ improperly weighed her treating urologist's medical source statement, (Docket Entry No. 15 at 16-21), and second, that the ALJ erroneously found her bladder impairments to be "non-severe" and failed to account for these

limitations in Plaintiff's RFC, id. at 21-25. Because the determination of whether an impairment is "severe" occurs at the second step of the ALJ's sequential disability evaluation, the Court addresses this argument first.

Plaintiff argues that the ALJ erred in finding that Plaintiff's urinary impairment was "non-severe" and failing to account for related limitations in Plaintiff's RFC. Id. at 21-25. "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a). Basic work activities are "the abilities and aptitudes necessary to do most jobs." Id. §§ 404.1521(b), 416.921(b). SSR 85-28 provides that "great care should be exercised in applying the not severe impairment concept" and explains the process for determining that an impairment is not severe: "A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities . . . ." "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." Rogers, 486 F.3d at 243 n.2 (quoting Higgs v. Bowen, 880 F.2d 860, 862 (6th Cir. 1988)).

Here, the ALJ acknowledged that Plaintiff has "well documented urinary incontinence" but stated that "the evidence regarding the severity of that condition is conflicting" before concluding that "[t]he evidence fails to establish that claimant's urinary incontinence has resulted in significant work related limitations that lasted for any period of 12 consecutive months." (Docket Entry No. 10 at 877-78). The ALJ also did not include any limitations regarding Plaintiff's urinary impairment in

her RFC. Id. at 879.

Even if the ALJ wrongly decided that Plaintiff's urinary impairment is "non-severe," this conclusion by itself is not grounds for remand because the ALJ determined that Plaintiff suffered from other severe impairments and continued the disability determination process. See Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987) (holding that it is not reversible error where an ALJ fails to find that an impairment is severe as long as the ALJ considers all of a claimant's impairments in an ensuing disability determination). In the disability determination, "the ALJ 'must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" Fisk v. Astrue, 253 F. App'x 580, 583 (6th Cir. 2007) (quoting Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5)). Thus, the relevant inquiry is whether substantial evidence supports the ALJ's decision to omit limitations related to Plaintiff's urinary impairment from her RFC.

Plaintiff argues that the ALJ's formulation of her RFC did not account for limitations related to her urinary impairment, such as: her "need to take unscheduled breaks due to her incontinence episodes," "the time [Plaintiff] would be off task due to bathroom breaks, incontinence episodes, or bladder pain and/or spasms," and "the potential absenteeism, tardiness, and/or leaving work early that would result due to these impairments." (Docket Entry No. 15 at 24-25). The Commissioner contends that the ALJ was not required to account for such limitations because the ALJ "had not found any significant limitation in functioning" in determining that Plaintiff's urinary impairment was "non-severe." (Docket Entry No. 16 at 16). The Court concludes that substantial evidence does not support the ALJ's determination that Plaintiff's urinary impairment was "non-severe" or the

ALJ's failure include any limitations related to Plaintiff's urinary impairment in her RFC. See Rogers, 486 F.3d at 243 n.2; Fisk, 253 F. App'x at 583.

Objective medical evidence from Plaintiff's visits to Dr. Gill from 2009 through 2011 establishes that Plaintiff's urinary incontinence significantly limited her ability to do basic work activities for more that 12 consecutive months. On April 28, 2009, Plaintiff visited Dr. Gill for the first time in years[3] complaining of "urgency, frequency, and very heavy asensory urinary leakage" beginning the day she woke up from her back surgery that occurred on July 1, 2008. (Docket Entry No. 10 at 495). Dr. Gill diagnosed Plaintiff with neurogenic bladder and opined that her symptoms were "very severe and not responsive to conventional treatment." Id. at 497. On July 23, 2009, Dr. Gill discussed with Plaintiff her "complex cystometric studies" that reflected "multiple low amplitude spontaneous involuntary to two contractions throughout the filling phase on two separate studies. Also showed one very high amplitude spontaneous involuntary detrusor contraction which resulted in massive leakage." Id. at 763. Dr. Gill opined that Plaintiff's neurogenic bladder was "related to her back injury" and was documented by "her complex cystometric studies and urodynamic studies." Id. at 1649. Dr. Gill recommended placement of a permanent InterStim generator for Plaintiff because Plaintiff had "failed other conservative pharmacologic therapies." Id. at 763.

In August and September 2009, Dr. Gill implanted Plaintiff with an InterStim device. Id. at 743-44, 758. The record reflects that Plaintiff's urinary incontinence was initially more controlled

---

[3]Dr. Gill previously treated Plaintiff for "severe urgency and urge incontinence" but noted that Plaintiff's bladder problems "completely resolved" after another doctor performed "some type of pelvic surgery." (Docket Entry No. 10 at 495).

than before, id. at 741-42, 755-56, 1633, 1639, but Plaintiff turned her InterStim off around early

2011 because she "did not think it was really helping that much," id. at 733. On March 31, 2011,

Plaintiff returned to Dr. Gill and stated that she was experiencing "lot[s] of urgency, frequency,

incontinence" after Plaintiff turned off her InterStim and Dr. Gill recommended that Plaintiff turn

it on again. Id. On July 19, 2011, Dr. Gill removed Plaintiff's InterStim device. Id. at 1224-26. As

the ALJ noted, Plaintiff's last visit to Dr. Gill reflected in the record was on August 23, 2011. Id.

877, 1600. The ALJ summarized this treatment note as follows: "Dr. Gill noted that the claimant

continued to have significant urinary incontinence following removal of her InterStim. The claimant

requested and received a prescription for 180 adult diaper per month." Id. at 877.

Despite this documented history of Plaintiff's urinary impairment imposing limitations, the

ALJ did not accommodate this impairment in his formulation of Plaintiff's RFC. The ALJ relied in

part on inconsistencies in Plaintiff's hearing testimony to conclude that her urinary impairment was

"non-severe." The ALJ described Plaintiff's testimony at her first hearing on April 6, 2011, as

follows:

> [T]he claimant testified that she had no bladder control whatsoever. She claimed she
> had frequent urinary accidents and was normally soaked with urine when she woke
> up from sleeping. However, when the claimant filed a subsequent application for
> disability benefits on July 18, 2012 she made no mention of urinary incontinence
> either in her disability report or in a very detailed function report.

Id. (internal citations omitted). The referenced disability and function reports were completed in July

and August 2012, respectively. Id. at 1106-16, 1132-39. Although Plaintiff did not mention her

urinary impairment on either of these forms, she did report it to Dr. Johnson in September 2012

during a consultative examination that was part of the disability determination process. Id. at 1357.

As to Plaintiff's second hearing on January 25, 2014, the ALJ stated:

> [S]he again testified that she has no bladder control whatsoever. She claimed she goes to the bathroom 15 to 20 times every day and has urinary accidents once or twice per day. She said she wears protective garments day and night. The claimant's testimony that she goes to the bathroom 15 to 20 times per day and has accidents only once or twice was inconsistent with her repeated testimony that she has no urinary control whatsoever.

Id. An ALJ's consideration of inconsistencies in a plaintiff's testimony is not inappropriate. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997) ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."). Yet, Plaintiff's urinary impairment is supported by objective evidence in the record, not just her hearing testimony. While the ALJ is not required to unconditionally adopt Plaintiff's specific testimony regarding her bladder issues in formulating Plaintiff's RFC, the absence of any limitations related to Plaintiff's urinary impairment is unsupported by substantial evidence. See id. ("[A]n ALJ's assessment of a claimant's credibility must be supported by substantial evidence.").

The ALJ noted also that "[t]he severe symptoms described by claimant are [] inconsistent with the absence of any recent treatment records." (Docket Entry No. 10 at 878). It is not improper for an ALJ to consider a plaintiff's failure to seek further examination or treatment in evaluating the plaintiff's credibility. See Strong v. Soc. Sec. Admin., 88 F.App'x 841, 846 (6th Cir. 2004). The record reflects that Plaintiff last visited Dr. Gill on August 23, 2011, at which time Dr. Gill prescribed Plaintiff 180 adult diapers per month. (Docket Entry No. 10 at 1600-02). On January 27, 2014, Plaintiff testified that she visited Dr. Gill more recently than August 2011, but that she had "permanent nerve damage" and "there was nothing really [Dr. Gill] can do for me except for

56

prescribing the undergarments that I wear." Id. at 911. The ALJ noted that, despite Plaintiff's testimony that she visited Dr. Gill more recently than August 2011, the ALJ did not receive any records documenting more recent visits even though Plaintiff's representative submitting updated records from other sources. Id. at 877.

Yet, in a June 2013 visit to Tennessee Physical Medicine and Pain Management, Plaintiff reported that she had "bladder issues due to L-spine, sees Dr. Gill" and was "wearing depends." Id. at 1822. In a July 2013 visit to the same provider, Plaintiff reported that she had continued "chronic urinary incontinence." Id. at 1818. These visits, approximately six months before Plaintiff's hearing, are consistent with her hearing testimony. See Rogers, 486 F.3d at 248 ("Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect."). To the extent that the ALJ found Plaintiff's complaints not fully credible due to a lack of recent treatment records from Dr. Gill, the Court nonetheless concludes that substantial evidence does not support the ALJ's omission of any restrictions related to Plaintiff's urinary impairment in her RFC. See Hubbard v. Comm'r of Soc. Sec., No. 11-11140, 2012 WL 883612, at *6 (E.D. Mich. Feb. 27, 2012) ("While the ALJ's credibility determination is entitled to considerable deference, the issue here is whether and to what extent the ALJ's RFC addressed plaintiff's need for bathroom breaks, and whether plaintiff's need for bathroom breaks precluded him from competitive work."), adopted by, 2012 WL 858636 (E.D. Mich. Mar. 14, 2012); Pelphrey v. Comm'r of Soc. Sec., No. 3:14-cv-303, 2015 WL 7273110, at *5 (S.D. Ohio Nov. 18, 2015) ("[E]ven if the ALJ found Plaintiff not fully credible, the ALJ should have made a specific finding regarding whether his conditions

would cause unscheduled breaks during the workday . . . ."), adopted by, 2016 WL 1109094 (S.D. Ohio, Mar. 21, 2016).

Dr. Gill's June 2011 medical source statement provides further support for the conclusion that Plaintiff's urinary impairment causes significant limitations that were not accounted for in Plaintiff's RFC. Plaintiff contends that the ALJ improperly weighed Dr. Gill's statement, and that it is "extremely significant evidence from Plaintiff's treating physician which is quite inconsistent with the ALJ's RFC finding and supports a finding of disability in her claim." (Docket Entry No. 15 at 16-17).

In his medical source statement, Dr. Gill and concluded that Plaintiff had "bladder pain/spasm" that was severe and adversely affected her concentration and sleep, and that Plaintiff's incontinence restricted her ability to perform competitive work activities. Id. at 620. Dr. Gill also found that Plaintiff suffered from a variety of exertional limitations. Id. at 618-19.

The ALJ discussed Dr. Gill's statement as follows:

> I also note the June 28, 2011 opinions of the claimant's treating urologist, Dr. Charles Gill, that the claimant has a wide assorted [sic] of physical limitations. I give little weight to those opinions because Dr. Gill makes no meaningful effort to support his opinions by reference to abnormal medical findings and because there does not appear to be any logical connection between the limitations indicated and the claimant's urinary impairment, which as already noted is not a "severe" impairment. Dr. Gill had no significant involvement in treating the claimant's "severe" impairments.

Id. at 886 (internal citation omitted). As the Court previously concluded, the ALJ's analysis of the physical limitations in Dr. Baker's medical source statements is supported by substantial evidence. Thus, the ALJ did not err in assigning Dr. Gill's findings of Plaintiff's physical limitations "little weight" because they were not related to Plaintiff's urinary impairment.

58

Yet, the ALJ seemingly ignored the limitations that Dr. Gill found regarding Plaintiff's urinary impairment. Because Dr. Gill was Plaintiff's treating urologist, the ALJ was required to provide "good reasons" for discounting Dr. Gill's opinion that are "sufficiently specific" and "supported by the evidence in the case record." Blakley, 581 F.3d at 406-07. As discerned by the Court, the only reason that the ALJ did not consider Dr. Gill's specific findings regarding Plaintiff's urinary impairment was that "Dr. Gill had no significant involvement in treating the claimant's 'severe' impairments."[4] (Docket Entry No. 10 at 886). Because the ALJ's conclusion that Plaintiff's urinary impairment was "non-severe" is not supported by substantial evidence, the ALJ's reliance on his severity analysis is not a "good reason" to discount Dr. Gill's opinion. See Blakley, 581 F.3d at 406-07. The Court concludes that, as pertains to Plaintiff's urinary impairment, the ALJ improperly considered Dr. Gill's June 2011 medical source statement. See Wilson, 378 F.3d at 541 ("The ALJ's summary dismissal of [a treating physician's] opinion fails to meet the requirement that the ALJ 'give good reasons' for not giving weight to a treating physician.").

In sum, the Court concludes that the ALJ did not err in weighing Dr. Baker's medical source statements, but that the ALJ did err in finding that Plaintiff's urinary impairment was "non-severe" and failing to include any limitations related to Plaintiff's urinary impairment in Plaintiff's RFC. As part of this error, the ALJ essentially ignored Dr. Gill's findings in his medical source statement regarding Plaintiff's urinary impairment. As discussed above, substantial evidence in the record as a whole shows that Plaintiff has a documented history of bladder issues. In these circumstances, the

---

[4]The ALJ also stated that Dr. Gill made "no meaningful effort to support his opinions by reference to abnormal medical findings," but the Court interprets this statement as a critique of Dr. Gill's findings regarding Plaintiff's physical limitations, not her urinary limitations.

ALJ must account for limitations related to urinary impairment in the RFC. See Hooks v. Comm'r of Soc. Sec., No. 3:13-CV-454, 2014 WL 4348182, at *7 (E.D. Tenn. Sept. 2, 2014) ("[W]here there is evidence that a claimant requires access to a bathroom as needed, an ALJ's RFC assessment should address the alleged limitation.") (citations omitted).

Accordingly, this action should be remanded for the ALJ to reassess the severity of Plaintiff's urinary impairment consistent with applicable regulations and this opinion. Plaintiff's disability should be considered based on the combined effect of Plaintiff's impairments after incorporating limitations regarding Plaintiff's urinary impairment in her RFC. See Faucher v. Sec'y of Health and Human Servs., 17 F.3d 171, 176 (6th Cir. 1994).

The ALJ's decision is not supported by substantial evidence and should be reversed and Plaintiff's motion for judgment on the record (Docket Entry No. 14) should be granted in part.

An appropriate Order is filed herewith.

**ENTERED** this the _18th_ day of August, 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge